OPINION OF THE COURT
George L. Jurow, J.
This matter is before the court by petitioner father’s motion for return pursuant to the Convention on the Civil Aspects of International Child Abduction (the Hague Convention, 19 ILM 1501) as implemented in the United States by the International Child Abduction Remedies Act (42 USC §§ 11601-11610). Petitioner alleges that the parties’ two minor children were wrongfully retained by the respondent mother in the United States. Petitioner, who lives in the United Kingdom (England), seeks the return of the children to that country. Respondent objects to the return and seeks dismissal of the petition on the ground that the children were not "habitual residents” of the United Kingdom, as that term is used in the Hague Convention, but rather, were settled in Nigeria.
An evidentiary hearing was held on February 9, 1995. The primary question before the court involves a determination of the children’s "habitual residence.” Having considered the oral and written arguments of counsel, as well as the relevant testimonial and documentary evidence, the following constitutes the court’s findings of facts and conclusions of law.
I
The objective of the Hague Convention is "to secure the prompt return of children wrongfully removed to or retained in any Contracting State” and "to insure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States.” (Hague Convention, art 1 [a], [b]; 42 USC § 11601 [a] [4].) Simply put, the "central core” of the Convention is aimed at "situations where one parent attempts to settle a difficult family situation, and obtain an advantage in any possible future custody struggle, by returning to the parent’s native country, or country of preferred residence * * * [T]he Hague Convention is clearly designed to insure that the custody struggle must be carried out, in the first instance, under the laws of the country of habitual residence.” (Friedrich v Friedrich, 983 F2d 1396, 1402-1403 [6th Cir 1993].) A Hague Convention proceeding is jurisdictional in nature and solely limited to the ques *568 tion whether the child should be returned to the country of habitual residence for determination of the custodial dispute; the ultimate issue of custody or the merits of the custodial dispute are not before the court.
It is the petitioner’s burden to establish, by a preponderance of the evidence, that the minor children were wrongfully removed or retained within the meaning of the Hague Convention. (42 USC § 11603 [e] [1].) In turn, there are two predicates a petitioner must establish in order to be entitled to relief under the Hague Convention: (1) it must be shown that the removal or retention involves a child who was "habitually resident in a Contracting State immediately before any breach of custody or access rights;” and (2) it must be shown that the petitioner had lawful rights of custody at the time of the removal or retention. (Hague Convention arts 3, 4.)
The focus of the inquiry in this proceeding is on the first predicate issue regarding habitual residence. The custodial rights issue was not thoroughly addressed at the hearing. Because the court’s finding with respect to the habitual residence issue is dispositive herein, the court does not, and need not, make a determination on the question of petitioner’s custodial rights.
II
The court had the opportunity to hear the testimony of both the petitioner father and the respondent mother and to assess the credibility of each. Although it is the opinion of the court that both parties have certain credibility problems,[1] the facts regarding the subject children’s whereabouts and the chronology of relevant events are largely undisputed.
Petitioner is a British national and respondent is a dual British and Nigerian national. They were married in December 1985 in England. The two subject children were born in England in February 1986 and July 1990, respectively. The *569 family resided together in England until the parties separated in July 1991 due to marital difficulties.
In or about July 1991, respondent mother and the two children went to Nigeria. It is in explaining the respondent’s intentions and purpose in going to Nigeria that the testimony of the parties is in conflict. Petitioner testified that it was his understanding that respondent was taking the children to Nigeria for a "visit” with respondent’s parents and family who reside there. He testified that although the trip was "open-ended”, he believed that respondent and the children would return to England within about three months. He also contended that a round-trip ticket had been purchased.
Respondent testified, in contrast, that in July of 1991, she and petitioner agreed to go their separate ways and further agreed that the children would remain with her. She testified additionally that her intention in going to Nigeria was to "start a new life” there. Respondent claimed that there was no time limit whatsoever on her intended stay.
The court credits respondent’s testimony with respect to her intention in going to Nigeria in July 1991. Moreover, the court finds that petitioner’s credibility on this point is undercut by his behavior and other factual developments in the subsequent months. Shortly after respondent’s arrival in Nigeria in July 1991 petitioner travelled to Nigeria himself for approximately one month. During that time, on August 2, 1991, respondent signed, and petitioner cosigned (as a witness), a lease for a four-bedroom home for respondent and the two children in Nigeria. The lease provided for a term of two years and contained an option to renew for another two years. The rent was fully paid in advance for three years. Thereafter, in September 1991, petitioner sent a trunk box from England to respondent in Nigeria containing items including respondent’s and the children’s clothing, and a variety of other personal possessions.
The testimony established that petitioner went to Nigeria for another visit in December 1991 for approximately three weeks. Three months later, in a letter dated March 5, 1992, petitioner addressed the Controller of Immigration Services in Nigeria requesting that respondent and the children be allowed to apply for a residence permit to live in Ibadan, Oyo State, Nigeria. Petitioner wrote: "After living for some 10 years in the United Kingdom and away from other members of the [sic] her family, Helen would like to stay for a lengthy *570 period with the children and get to know her family and Nigeria better.”
In April of 1992, however, respondent and the two children returned to England. Respondent testified that the reason for her return to England at that time was to obtain a divorce from the petitioner. In fact, the parties were divorced on October 9, 1992, pursuant to a decree issued by the Watford County Court, England. (No particular custody order was issued by that court.)
Respondent and the children remained in England (for a total of approximately nine months) before returning to Nigeria. Respondent testified her purpose in remaining in England was to attend college. During this time, respondent did attend college and the children were enrolled in school. They lived in an apartment in South London not far from the petitioner’s home.
Following the school year, and after experiencing difficulties at college, in or about June of 1993, respondent went back to Nigeria with the children. Petitioner testified that he consented to her going to Nigeria again and that "it wasn’t defined exactly when the return would be”. In Nigeria, respondent and the children resumed their occupancy of the home that respondent had previously leased. Moreover, the children attended school in Nigeria during the 1993-1994 term.
In August of 1994, respondent and the children again went to England. Respondent testified that petitioner had ceased sending her necessary financial support. (Petitioner claimed otherwise.) They remained in England for approximately seven weeks. During this period, respondent applied for public assistance, and she and the children stayed at the homes of various friends and relatives (including petitioner) and in a hotel. Respondent did not make any arrangements for more permanent living accommodations in England. The children were not enrolled in school in England for the fall term. Although respondent did not renew the lease for her home in Nigeria, most of her personal belongings remained in Nigeria at the home of her uncle.
Respondent and the children left England and arrived in New York on September 24, 1994, thus beginning the chain of events that led to this proceeding. Petitioner testified that he consented to respondent and the children going to New York for a "holiday period” because she "needed a break”. He stated that he hoped the visit to New York would last "for a month at most. But I wasn’t sure if it would last longer”.
*571 On December 21, 1994, petitioner came to New York. He testified that the purpose of his trip was to find his children and return with them to England. To this end, petitioner took various steps which culminated in the filing of the instant petition for return pursuant to the Hague Convention. Petitioner stated that if the children are ordered to be returned to England, it is his intention to file in England for legal and physical custody.
Ill
As noted above, under article 3 of the Hague Convention petitioner must show that immediately before the child’s removal, the child was habitually resident in a contracting State. Both the United Kingdom and the United States are contracting States (signatories) to the Convention; Nigeria is not. Because petitioner seeks the children’s return to the United Kingdom (England) petitioner must prove that the children were habitual residents of the United Kingdom immediately prior to their removal to the United States.
A curious feature of the Convention is that although the term "habitual residence” is a critical predicate term it is undefined in the Convention. In addition, because Hague Convention proceedings are relatively infrequent there is only a small body of case law in the United States that has sought to define the term and its applicability to a variety of factual situations. As noted by one court, the apparent intent is for the concept to remain fluid and fact based, without becoming rigid. (Levesque v Levesque, supra, 816 F Supp, at 666.)
A review of the existing case law reveals that most cases are indeed heavily "fact-based”, with little doctrinal exposition defining the term habitual residence. However, there is an emerging consensus in the majority of recently reported cases in the United States (see, Friedrich v Friedrich, 983 F2d 1396, supra; Levesque v Levesque, supra, at 665; Matter of Ponath, 829 F Supp 363 [D Utah 1993]; Slagenweit v Slagenweit, 841 F Supp 264 [ND Iowa 1993], appeal dismissed 43 F3d 1476 [8th Cir 1994]; Falls v Downie, 871 F Supp 100 [D Mass 1994]) that British courts have provided a useful analysis of the term habitual residence. Cited in all these cases is language in In re Bates (No. CA 122/89, High Ct of Justice, Family Div’n Ct, Royal Ct of Justice, United Kingdom [1989]).
The Bates court initially quotes Dicey & Morris, Conflicts of Laws 166 (11th ed) as follows: "No definition of 'habitual *572 residence’ has ever been included in a Hague Convention. This has been a matter of deliberate policy, the aim being to leave the notion free from technical rules, which can produce rigidity and inconsistencies as between different legal systems * * * It is greatly to be hoped that the courts will resist the temptation to develop detailed and restrictive rules as to habitual residence, which might make it as technical a term of art as domicile. The facts and circumstances of each case should continue to be assessed without resort to presumptions or pre-suppositions.”
After noting that "there is no real distinction between ordinary residence and habitual residence”, the court then quotes Shah v Barnet London Borough Council (2 AC 309, 314 [1983]): "and there must be a degree of settled purpose. The purpose may be one or there may be several. It may be specific or general. All that the law requires is that there is a settled purpose. That is not to say that the propositus intends to stay where he is indefinitely. Indeed his purpose while settled may be for a limited period. Education, business or profession, employment, health, family or merely love of the place spring to mind as common reasons for a choice of regular abode, and there may well be many others. All that is necessary is that the purpose of living where one does has a sufficient degree of continuity to be properly described as settled.” (In re Bates, at 10-11, supra [emphasis added].)[2]
In this case, it is clear that the United States cannot qualify as the habitual residence. (The parties do not contend otherwise.) As pointed out in Friedrich (supra), habitual residence *573 pertains to customary residence prior to the removal (or retention). Moreover, habitual residence can be "altered” only by a change in geography and the passage of time. Otherwise, any removal or retention could be characterized by the subject parent as a change in habitual residence, a claim that would defeat the purpose of the Convention. Factually, the respondent mother and children, who are temporarily residing in the New York City shelter system, and who have been in the City for a relatively short period of time prior to the institution of these proceedings, are clearly not settled in the United States.
The issue, therefore, is whether, given the factual history, the children were habitual residents of England or of Nigeria prior to their retention in the United States. In this court’s judgment, the evidence supports the respondent mother’s argument that the children were residents of Nigeria for the following reasons:
First, a majority of the time that the children have spent since the parties separated in July 1991 has been spent in residency in Nigeria. Second, in the full year from June 1993 through July 1994 (prior to the relatively brief seven-week stay in England) the children resided in Nigeria. Third, during the time the children resided in Nigeria with their mother they lived in a four-bedroom house pursuant to a long-term lease. While living in this house the children and their mother had all their possessions. The children also continuously attended school. Fourth, in 1992 petitioner supported the application by the mother and children for a residence permit to live in Nigeria. Fifth, many of the mother’s possessions still remain in the home of a relative in Nigeria. Sixth, the mother (and apparently the children as well) retain Nigerian citizenship, the place where most of the mother’s close relatives also live. Seventh, the sojourn to England, prior to the move to the United States, was relatively brief; the children and their mother had no fixed residence, but rather, in a transient manner, moved from place to place. The mother’s application for public assistance in England, during the seven-week period, motivated by perceived economic plight, did not alter the transient nature of her and the children’s stay in England.
In sum, and in accordance with the principles delineated in Bates (supra) as concurred in by the United States precedents (supra), the above factors clearly point to Nigeria as the place where, prior to the children’s removal to the United States, there was a "sufficient degree of continuity to be properly *574 described as settled” (In re Bates, supra) and, therefore, the habitual residence under the Hague Convention.[3]
Nothing in this opinion should be construed in any way as expressing any view concerning the ultimate substantive merits of the custodial conflict between the parties. That issue, if not resolved by the parties themselves, would have to be resolved in accordance with jurisdictional principles and applicable law without resort to the Hague Convention.
Accordingly, the petition is dismissed.

. For example, petitioner was less than credible in his claims that respondent’s recurrent trips abroad from England were intended to be time limited; respondent was less than credible in her evasive testimony concerning her varied applications for and use of passports.
As noted in Levesque v Levesque (816 F Supp 662, 666, n 3 [D Kan 1993]) "determining credibility” in this type of case, "where both parents obviously care about the child’s welfare and are seeking a ruling in their favor, is a difficult task at best. At worst, it does a disservice to the parties, by tending to discredit one of the parent’s testimony. The court recognizes that each party’s truth is colored by his/her perception.”

. Although one case, Matter of Cohen v Cohen (158 Misc 2d 1018 [Sup Ct, NY County 1993]), suggests that cases involving the issue of "domicile” provide a useful analogy to the term habitual residence, the weight of authority suggests otherwise. (See, Perez-Vera, Explanatory Report, § 64 [the Perez-Vera Report is considered an official commentary on the Convention]; Dicey & Morris, op cit.; Friedrich v Friedrich, supra, at 1401 [arguing that habitual residence is distinct from and should not be confused with the common-law term domicile].)
On the distinction between "domicile” and "residence”, see 49 NY Jur 2d, Domicil and Residence, § 2 and Matter of Larkin v Herbert (185 AD2d 607, 608 [3d Dept 1992] ["Residence means living in a particular locality, but domicile means living in that locality with intent to make it a fixed and permanent home”]).
Although the term habitual residence may appear to be a hybrid of the terms domicile and residence, and although all three may, depending on context, contain factual variables in common, the terms are capable of distinction. The authorities noted in the general text above indicate that the term habitual residence is intended to be conceptually more similar to that of residence than to domicile.

. Even if, as the father contends, the mother always and ultimately intended to return to, or even permanently settle in England, throughout her residential tenure with the children in Nigeria, such intention would not alter the finding of Nigeria as the habitual residence. Such intention, if it existed, would be germane to an argument that England was the domicile of the children. (See, n 2, supra.)