Steven Mishkin **PESIN,**
Petitioner/Husband,

v.

Maria Teresa **OSORIO RODRIGUEZ,**
Respondent/Wife.

No. 99–6962–Civ.

United States District Court,
S.D. Florida,
Fort Lauderdale Division.

Dec. 16, 1999.

---

Dori Foster–Morales, Miami, FL, for Petitioner.

Peter H. Kircher, Miami, FL, Kimberly L. Boldt, Barranco, Kircher & Vogelsang, Miami, FL, for Respondent.

## ORDER GRANTING PETITION FOR THE RETURN OF MINOR CHILDREN

LENARD, District Judge.

**THIS CAUSE** is before the Court on Steven Mishkin Pesin's Petition for the Return of the Minor Children and on Respondent Maria Teresa Osorio Rodriguez's Motion to Dismiss or Abate. This Order memorializes the Court's oral ruling of December 10, 1999. Having reviewed the record *de novo,* and having been otherwise advised in the premises, the Court finds as follows.

### I. Introduction

Petitioner brought this Petition on July 27, 1999 under the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,-670, at 4 ("Hague Convention"), as implemented by the United States in the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. §§ 11601–11610 (1988). Petitioner argues under the Hague Convention that his wife, Respondent, has wrongfully retained their two minor children in the United States, and that the children must therefore be returned to their "habitual residence" of Venezuela. Respondent contends that the children's habitual residence is the United States, that Petitioner was not exercising custody at the time of the alleged date of wrongful retention, and, in the alternative, that Petitioner acquiesced to the children's residency in the United States. In her Motion to Dismiss and Abate, filed August 18, 1999, Respondent argues further that this Court lacks subject matter jurisdiction to review the Petition, pending the outcome of the parties' marital dissolution proceedings, because the Circuit Court for

the Eleventh Judicial Circuit of Florida has already exercised custody over the children.

After a review of the record, the Court determines that Petitioner has established a prima facie case of wrongful retention and that the children should be returned to their habitual residence of Venezuela. Supporting this determination are findings that (a) the children's habitual residence immediately before the date of wrongful retention was Venezuela, (b) Respondent's retention of the children was in breach of Venezuelan law, and (c) Petitioner was exercising custody at the time of the wrongful retention. The Court further resolves that Petitioner did not subsequently acquiesce to Respondent's retention of the children in the United States. To reach these conclusions, the Court examines under the Hague Convention, "habitual residence," "exercising custody rights," and "subsequent acquiescence," apparently questions of first impression in the Eleventh Circuit.

## II. Factual Background

The factual record for this case largely derives from the testimony of Petitioner, Respondent, and Respondent's brother, Claudio Osorio, at an evidentiary hearing in front of United States Magistrate Judge William C. Turnoff on August 12, 1999. The pertinent factual background of this case spans a ten-month period, beginning in October 1998, when the parties began having marital problems, to July 27, 1999, when the Petition for the Return of the Children was ultimately filed. For clarity's sake, the Court presents these facts chronologically.

### A. Marital Problems Begin

The parties were married in the Republic of Venezuela on July 30, 1988. (*See* Pet. ¶ 10.) Their two children were born in Venezuela on September 15, 1994 and on March 6, 1992 respectively. (*See* Pet.

¶ 11; Tr. Hr'g of 8/12/99 at 22.) The family had lived in the same Caracas, Venezuela home in which Petitioner and Respondent had resided since the date of their marriage. (*See* Pet. ¶¶ 10 & 12; Tr. Hr'g of 8/12/99 at 22.) However, in October 1998, Petitioner moved to his mother's house, also located in Caracas, when the parties began having marital problems. (*See* Tr. Hr'g of 8/12/99 at 28, 52 & 75.) The record does not indicate that either party sought divorce or legal separation at that time. (*See also* Tr. Hr'g of 8/12/99 at 29.)

### B. Family Departs for Winter Vacation in Florida, December 19, 1998

Accustomed to taking an annual winter holiday vacation in Florida, the family traveled on December 19, 1998 to South Florida for what the parties had scheduled to be a 23–day vacation in South Florida. (*See* Pet. ¶ 13; Tr. Hr'g of 8/12/99 at 23–24.) Prior to departure, according to Petitioner's testimony, Respondent packed a suitcase "with her Christmas clothes and her vacation clothes" and one suitcase for both children "with their Christmas clothes and vacation clothes." (Tr. Hr'g of 8/12/99 at 30.) Respondent left all of her other belongings inside their house in Caracas. (*See id.*)

Once in Florida, Petitioner and Respondent continued to stay at separate addresses throughout the majority of their vacation.[1] Respondent stayed in Fort Lauderdale with the children, and Petitioner stayed in Miami. (*See id.* at 50 & 76.) Yet, throughout the vacation, Petitioner testified he visited his children in the mornings and had dinner with Respondent and the children each evening. (*See id.* at 50 & 52.)

### C. Petitioner's First Meeting with Respondent's Brother

During the first week of January 1999, Respondent's brother, Claudio Osorio, met

---

1. During the family's side trip to Aruba, the entire family stayed together inside one

"unit." (Tr. Hr'g of 8/12/99 at 51.)

with Petitioner at a restaurant in Miami. (*See id.* at 99.) Mr. Osorio testified he told Petitioner that Respondent wanted to stay in Florida longer than the family had planned. (*See id.* at 100.) According to Mr. Osorio, he and Petitioner discussed Respondent "living in Miami, enrolling the kids in school in Miami, and setting up a budget for their living expenses in Miami." (*Id.*)

Mr. Osorio further testified that Petitioner agreed to Respondent's intentions and subsequently met with her. (*Id.*) Mr. Osorio added that a "budget was established, which [Petitioner] started to—he provided for [them] from then on." (*Id.* at 100.) As part of the voluntary agreement he worked out with Mr. Osorio, Petitioner testified that he provided support for his wife and the children for the full six months of January through June. (*See id.* at 63–64.) However, the record does not indicate the specific date in January that Petitioner agreed to support them.

### D. Petitioner Returns to Venezuela Alone on January 11, 1999

On January 11, 1999, the family's scheduled date of departure from Florida, Petitioner testified that he flew back to Venezuela by himself, after he had agreed to Respondent's request that she and the children stay in the United States for an additional six days. (*See* Pet. ¶ 15; Tr. Hr'g of 8/12/99 at 24–25.) Respondent "wanted to stay a couple of more days and school hadn't started yet," Petitioner testified. (Tr. Hr'g of 8/12/99 at 25.) But, instead of returning to Venezuela with the parties' children on January 18, 1999 as planned, Respondent phoned Petitioner to say that she and the children had missed their flight. (*See* Pet. ¶ 16.) Plaintiff testified that Respondent then informed him that she was unable "to get a flight for another full week due to the airlines' schedule," but that she would get further reservations. (*Id.*; *see* Tr. Hr'g of 8/12/99 at 28.) After a week elapsed with no return to Venezuela, Respondent told Petitioner she was " 'confused' about her feel-

ings toward [him] and wished to remain in Florida." (Pet.¶ 16.)

### E. Petitioner's Attempts at Reconciliation: January 11, 1999 to June 18, 1999

Though Petitioner and Respondent had enrolled their children in a Caracas school for the entire 1998–1999 school year, Respondent enrolled the children at the David Posner Hebrew Day School in South Florida. (*See* Tr. Hr'g of 8/12/99 at 25–27, 29 & 81.) Petitioner testified that he neither agreed to the Respondent and the children remaining in Florida or to the children's enrollment in school in the United States. (*See id.* at 29 & 56; Pet. ¶ 17.) However, Petitioner testified that he did not pull the children out of the day school in Florida because he did not want to "torment" his children by abruptly disrupting their semester. (Tr. Hr'g of 8/12/99 at 58 & 66.) Petitioner provided $7,000.00 support per month between January and June 1999. (*See id.* at 79 & 63–64.)

Petitioner further testified that he tried to convince his wife and children to come back to Venezuela and that "he wished to make his relationship with his wife work out." (Pet. ¶ 18; Tr. Hr'g of 8/12/99 at 58.) "At no moment did she mention the word 'divorce,' " Petitioner testified. "She said she was taking time to think things over." (Tr. Hr'g of 8/12/99 at 29.) However, Respondent testified that "[i]n January, I let him know that I was not going to return. And I have continued saying always that I'm not going to go back. But, he has never paid attention to it." (*Id.* at 77.)

Between January 11 and June 18, 1999, Petitioner stated that he did not file for divorce because he had been operating under "the presumption that she said that we were going to arrange things." (*Id.* at 60.) Prior to June 18, Petitioner spoke with Respondent and their children every day and wrote numerous letters to them. (*See id.* at 30–31.) He visited the children every two or three weeks and took the children on vacation to Disney World on

two weekends, in February and May 1999. (*See id.* at 29, 35, 67 & 101.) Petitioner also took the children on a seven-day ski trip to Copper Mountain, Colorado in April 1999. (*See id.*) Petitioner testified that he brought the children's clothes from Venezuela to Florida, but Respondent's belongings remained in the family's Caracas home. (*See id.* at 70.) On June 8, 1999, Petitioner sent Respondent an 11–page letter explaining that in an effort to reconcile their differences, Petitioner had agreed to the decisions and requests she made. (*See generally* Letter from Mishkin Pesin to Osorio Rodriguez of 6/8/99.)

### F. June 18, 1999

During the course of their telephone conversations, Petitioner testified he and Respondent planned that he would pick up the children when they finished school on June 18, 1999, and take them back to Venezuela for three weeks preceding the start of summer camp in Miami. (*See* Tr. Hr'g of 8/12/99 at 31–32, 36–37 & 101–02.) In summers prior to the summer of 1999, the children "normally" spent the "whole summer" in Miami. (*Id.* at 37.) Following camp, Petitioner stated the children were "to start their school in Caracas." (*Id.* at 32 & 37.)

Petitioner testified he arrived in South Florida late in the evening, on June 17, 1999. (*See id.* at 37–38.) Immediately upon arrival, Petitioner called Respondent to see if she had the children's suitcases and the passports prepared, and if "everything was set for [Petitioner] to pick up the children." (*See id.* at 37.) She told him that "yes, everything was prepared." (*Id.* at 38.) Petitioner further testified Respondent instructed Petitioner to pick up the children at 11:00 a.m., on June 18, 1999, in front of the school and then retrieve their suitcases and passports at Respondent's apartment. (*See id.*) Yet, Petitioner testified the instructions changed on the morning of June 18, 1999. (*See id.* at 38–39.) That morning, Petitioner stated he had breakfast with Mr. Osorio. (*See id.*) Mr. Osorio told Petitioner that Respondent had filed for divorce two days

earlier and informed Petitioner that he could see his children, only if he met the following four conditions: (1) that Petitioner sign a document "accepting that [the children] lived in the State of Florida;" (2) that Petitioner send Respondent a certain amount of money every month; (3) that Petitioner sign a document consenting to a no-contest divorce; and (4) that Petitioner liquidate the family's home in Caracas and share half the proceeds with Respondent. (*Id.* at 38–39 & 102–03.) According to Petitioner, at that time, neither he nor his wife had yet discussed either divorce or the long-term prospect of their children "remaining in Venezuela or remaining in Florida." (*Id.* at 40 & 43.) "[T]hroughout the entire time, we were in conversations to arrange things," Petitioner said. (*Id.* at 68.)

Petitioner stated he refused to sign Mr. Osorio's papers and told Mr. Osorio that Petitioner was going to pick up the children as scheduled. (*See id.* at 40.) Petitioner testified he then called Respondent. (*See id.*) Petitioner told her that he had met with her brother, but did not discuss what transpired at the meeting. (*See id.*) Petitioner asked his wife when he should pick the children up from school. (*See id.*) Respondent replied, "Don't come at 11:00. Come at 12:00." (*Id.*) Petitioner further testified he arrived at the school at 11:45 a.m. only to learn that Respondent had picked both children up from school at 11:00 a.m. (*See id.* at 41.) After a thorough search for the children, Petitioner could not find them. (*See id.*) Petitioner stated he finally reached Respondent's brother, who told Petitioner that he could not see the children until he "came to an arrangement." (*Id.* at 42.)

Petitioner testified further that at 8:00 p.m., the same day, Respondent called Petitioner and stated that she wanted to meet with him. (*See id.*) Petitioner then picked her up at Mr. Osorio's house and drove to a restaurant, where they conversed. (*See id.*) Petitioner testified he asked Respondent where the children

were, and she said that she would not allow him to see the children until he signed the divorce papers, which he did not do. (*See id.* at 42–43.) Petitioner returned without the children to Caracas, Venezuela on June 19, 1999. (*See id.* at 43.) On June 21, 1999, Petitioner filed for divorce in Venezuela. (*See* Pet. ¶ 25.) On July 27, 1999, Petitioner filed the instant Petition in this Court.

### III. Jurisdiction

The Hague Conference on Private International Law's 29 member states convened in 1980 and enacted the Hague Convention in order to accomplish the following objectives: (1) "to secure the prompt return of children wrongfully removed to or retained in any Contracting State" and (2) "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States." Hague Convention art. 1. The United States and Venezuela are both signatories to the Hague Convention.[2] Enacting the International Child Abduction Remedies Act ("ICARA"), Congress ratified and implemented the Hague Convention in 1988. "The Courts of the States and the United States district courts shall have concurrent original jurisdiction arising under the Convention." 42 U.S.C. § 11603(a). Reviewing a petition for the return of the children filed initially in state court and subsequently in federal court, the *Lops* court upheld the federal district court's jurisdiction. *See Lops v. Lops,* 140 F.3d 927, 934–42 (11th Cir.1998) (finding action filed initially in state court without final judgment does not bar federal court's jurisdiction by collateral estoppel). Under ICARA, "a person may file a petition for the return of a child in any court authorized to exercise jurisdiction 'in the place where the child is located at the time the petition is filed.'" *Lops,* 140 F.3d at 936 (quoting 42 U.S.C. § 11603(b)). The Court is therefore authorized to exercise jurisdiction as the children are located in the Southern District of Florida, and this action takes precedence over any action filed in Florida state court.

As a threshold matter, Article 19 of the Hague Convention and § 11601(b)(4) of ICARA require courts reviewing petitions for the return of the children to decide the merits of an abduction claim, but not the merits of any underlying custody dispute. *See Lops,* 140 F.3d at 936 (citations omitted). This Court therefore limits its inquiry to whether retention of the children was wrongful, and, if so, whether Petitioner subsequently acquiesced to this wrongful retention.

### IV. Analysis

#### A. Prima Facie Case of Wrongful Retention

■ Petitioner seeks to establish a prima facie case of wrongful retention under the Hague Convention. Under Article 3 of the Hague Convention, the signatories' courts may find wrongful retention where

> (a) [the retention of the child] is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

> (b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

*Lops,* 140 F.3d at 935 (quoting Hague Convention art. 3). "The [retention] of a child from the country of his or her habitual residence is 'wrongful' under the Hague Convention if the petitioner 'is, or otherwise would have been, exercising custody rights to the child under that country's law at the moment of [retention].'" *Lops,* 140 F.3d at 936 (quoting *Friedrich v. Friedrich,* 78 F.3d 1060, 1064 (6th Cir.1996)

---

2. As of the date of this decision, 47 countries have signed the Hague Convention. *See* Bureau of Consular Affairs, *Hague Convention of* *25 October 1980 on the Civil Aspects of International Child Custody* (visited Dec. 15, 1999) <http://travel.state.gov/hague–list.html>.

[hereinafter *Friedrich II* ] (citing Hague Convention art. 3)). To establish a prima facie case of wrongful retention under the Hague Convention, Petitioner bears the burden of proof to show by a preponderance of the evidence that (1) the habitual residence of the children "immediately before" the date of the alleged wrongful retention was Venezuela, and (2) the retention is in breach of custody rights under Venezuelan law, and (3) he was exercising custody of the children at the time of their alleged wrongful retention. Hague Convention art. 3.[3]

The Eleventh Circuit in *Lops*, 140 F.3d at 927, reviewed a petition for the return of a child under the Hague Convention. In that case, the parties did not dispute that a prima facie case of wrongful removal had been established. *See id.* at 945. The *Lops* court therefore had no need to analyze whether the petitioner had established a prima facie case of wrongful removal or retention, beyond citing and paraphrasing Article 3 of the Hague Convention. *See id.* Moreover, the respondent in *Lops* asserted the "well settled" affirmative defense under Article 13 of the Hague Convention, but not the "subsequent acquiescence" affirmative defense raised by Respondent *sub judice*. *See id.* (finding children were not "well settled" in the abducted-to country). Decisions by other courts therefore guide this Court's scrutiny of whether the retention was wrongful, and, if so, whether Petitioner consented or subsequently acquiesced.

## 1. Habitual Residence

Courts in both the United States and foreign jurisdictions have defined habitual residence as "the place where [the child] has been physically present for an amount of time sufficient for acclimatization and which has a 'degree of settled purpose' from the child's perspective." *Feder v. Evans–Feder*, 63 F.3d 217, 224 (3d Cir. 1995) (relying on *Friedrich v. Friedrich*,

983 F.2d 1396, 1401–03 (6th Cir.1993) [hereinafter *Friedrich I*], and *In re Bates*, No. CA 122–89, High Court of Justice, Family Div'l Ct. Royal Courts of Justice, United Kingdom (1989)). "A determination of whether any particular place satisfies this standard must focus on the child and consists of an analysis of the child's circumstances in that place and the parents' present, shared intentions regarding their child's presence there." *Feder*, 63 F.3d at 224. In *Feder*, the court found that Australia was the child's habitual residence, despite the fact that he spent the majority of his years in the United States. *See id.* at 224. In making its determination, the *Feder* court focused on "the approximately six months ˙ that [the child] lived in Australia immediately preceding his return to the United States and the circumstances of his life in Australia." *Id.* The *Feder* court based its findings on the parents' shared intentions for their child and ultimately disregarded the mother's unilateral decision that she and the child live in the United States once the parties' marriage dissolved. *See id.* at 224 & n. 13. Also aiding the *Feder* court's conclusion that Australia was the child's habitual residence were the child's attendance at an Australian pre-school and his enrollment in an Australian kindergarten for the upcoming school year. *See id.* at 224.

Under the Hague Convention, the relevant period of habitual residence is that span of time "immediately before" the date of the alleged wrongful retention. *See Shalit v. Coppe*, 182 F.3d 1124, 1127 (9th Cir.1999) (mandating that "removal or retention of a child is wrongful where 'it is in breach of rights of custody attributed to a person ... under the law of the State in which the child was habitually resident immediately before the removal or retention' ") (quoting Hague Convention art. 3(a)); *Feder*, 63 F.3d at 224 (concluding that "Australia was [the child's] habitual residence immediately prior to his reten-

---

**3.** In order for the Court to determine that retention was in breach of "the law of the State of the habitual residence," the Court

must first determine the children's habitual residence immediately before the date of wrongful retention.

tion in the United States by [his mother]"); *Friedrich II*, 78 F.3d at 1064 (finding that "removal of a child from the country of its habitual residence is wrongful under the Hague Convention if a person in that country is, or would otherwise be, exercising custody rights to the child under that country's law at the moment of removal") (citing Hague Convention art. 3). Here, Petitioner has alleged in his Bill of Particulars that the date of wrongful retention was January 11, 1999. The Court must therefore determine whether the children's 23–day stay in Florida immediately prior to January 11, 1999 is sufficient to establish their habitual residence in the United States. The Court finds that it does not.

 No court has held that 23 days is sufficient under the Hague Convention for children to acclimatize themselves to a new country and become settled there. Compare *Ohlander v. Larson*, 114 F.3d 1531, 1539 n. 7 (10th Cir.1997) (finding child's 12–month stay in Sweden not sufficient to change habitual residency from the United States to Sweden), with *Shalit*, 182 F.3d at 1128 & n. 5 (affirming district court's finding that habitual residence was Israel after child spent three years there, despite one parent's claimed intention to return child permanently to Alaska). Habitual residence can be " 'altered' only by a change in geography [which must occur before the questionable removal] and the passage of time, not by changes in parental affection and responsibility." *Feder*, 63 F.3d at 222 (citation omitted) (alteration in original).

Attempting to determine habitual residence, courts have recognized that young children often have little to no control over where they live. *See id.* (discussing *In re Bates*, No. CA 122/89, High Court of Justice, Family Div'l Ct. Royal Courts of Justice, United Kingdom (1989)). Analyzing the habitual residence of a two-and-a-half-year old, the *Bates* court concluded that "the conduct and the overtly stated intentions and agreements of the parents during the period preceding the act of abduction are bound to be important factors and it would be unrealistic to exclude them."

*Feder*, 63 F.3d at 223 (quoting *Bates*, slip op. at 10); *cf. Nunez–Escudero v. Tice–Menley*, 58 F.3d 374, 378 (8th Cir.1995) (finding that six-week old baby was too young to determine its own habitual residence). Though older than the girl in *Bates*, the children *sub judice* were four and six years old at the time of the alleged wrongful retention. As such, the children's tender ages compel the Court to focus on their parents' actions and shared intentions.

The Court first finds that the parties and the children resided in Caracas, Venezuela preceding their December 1998 trip to South Florida. Relying on the previously purchased round-trip tickets for the entire family to depart the United States on January 11, 1999, the Court further finds the parents' settled purpose of their family trip to Florida was, as planned, a family vacation finite in its duration. (*See* Pet'r Ex. 4; Tr. Hr'g of 8/12/99 at 23.) Second, the parties had packed for only a temporary visit, rather than a permanent move. *See David B. v. Helen O.*, 164 Misc.2d 566, 570, 625 N.Y.S.2d 436 (Fam. Ct.1995) (finding that parent's decision to leave behind personal belongings is relevant in determining child's habitual residence). Immediately before their retention, the children were enrolled for the entire school year in a Venezuelan school. Though Mr. Osorio and Petitioner spoke of the eventuality that the children might attend school in Florida, Petitioner and Respondent did not discuss the children's enrollment at a Florida day school until Respondent informed him after January 11, 1999 that she had unilaterally enrolled the children there for the second semester of the 1998–1999 school year. The Court therefore finds that Petitioner's eventual, reluctant agreement to their enrollment in the Florida school on January 18, 1999 does not evince the parents' settled purpose for the children to remain in Florida immediately prior to January 11, 1999. *See Feder*, 63 F.3d at 224 (finding habitual residence was Australia, where parents had planned for their son to live, where he

stayed for six months, where he attended pre school during that time, and where he was enrolled to attend kindergarten for the following year). Finding Petitioner and Respondent lacked a shared intention for the children to stay in Florida, the Court concludes that Venezuela was the children's habitual residence immediately before January 11, 1999.

### 2. Breach of Custody Rights under Venezuelan Law

■ Having established that Venezuela was the country of habitual residence immediately before the date of retention, the Court now examines whether Respondent's retention of the children on that date breached Petitioner's custody rights under Venezuelan law. The Court finds such breach.

In its July 29, 1999 Letters Rogatory, the Second Court of First Instance in Family and Juvenile Matters of the Judicial Circuit of the Metropolitan Area of Caracas ("Caracas trial court") ruled, pursuant to Article 261 of the Venezuelan Civil Code, that Petitioner and Respondent "are vested with the paternal authority until a judicial decision establishes otherwise," and that Petitioner was "exercising the rights inherent to parental authority jointly with his spouse Maria Teresa Osorio." (Pet.Ex. 5 at 4.) The Letters Rogatory also cited Article 264 of the Civil Code, which states that the "father and mother who exercise parental authority have custody of their children ... shall elect by

mutual consent their place of domicile, residence or domicile [sic]." (*Id.* Ex. 5 at 3.)

Applying this law to the facts of Petitioner's divorce proceedings before the Caracas trial court, that court ruled that at the time when Respondent and the children "moved," Petitioner "was exercising the rights inherent to parental authority jointly with his spouse." (*See id.* Ex. 5 at 4.) This Court agrees and finds that Petitioner possessed de jure custody rights of his children at the time of the retention.[4] The Court further finds that Respondent's retention of the children at that time was therefore in breach of Venezuelan law.

### 3. Exercising Custody Rights

■ As with "habitual residence," the issue of "exercising custody" under the Hague Convention was not contested before the *Lops* court. *See Lops,* 140 F.3d at 945. Even in cases where the parties have contested whether the petitioner was exercising custody rights, courts have discussed possession of these custody rights without examining whether the petitioner was exercising them. *See, e.g., Shalit,* 182 F.3d at 1129–31 (concluding parent did not possess custody rights and therefore did not reach whether parent was exercising custody rights); *Feder,* 63 F.3d at 226 (omitting analysis of "exercise" because respondent conceded that her husband was exercising his custody rights).

Broadly defining "exercise," however, the *Friedrich II* court found a parent exer-

---

4. Article 264 of the Venezuelan Civil Code also mandates,

> When the father and mother have separate residences, in the event there is no agreement between the parents, the Judge on Juvenile Matters shall determine which of the two shall have custody of the children In any case, custody of children under seven (7) years of age shall pertain to the mother. . . .

(Pet.Ex. 5 at 3.) Respondent extrapolates from the last sentence of this quotation that at the time of the alleged wrongful retention, she alone had custody rights to the children, who were both under seven on January 11, 1999. Even assuming that the parents were living in separate residences on January 11, 1999, this Court disagrees with Respondent and adopts the Magistrate's analysis of this issue.

Article 264 provides that the Judge on Juvenile Matters shall determine which separated parent has custody of the children and when doing so, shall grant custody to the mother, when the children are under seven years old. However, the Judge on Juvenile Matters has yet to make such a ruling regarding which parent had custody rights to the children on January 11, 1999. As such, this Court need not consider the last sentence of the foregoing statutory language from Article 264 for purposes of determining whether Petitioner was in possession of custody rights to the children on January 11, 1999.

cises custody whenever such "a parent with de jure custody rights keeps, or seeks to keep, any sort of regular contact with his or her child." *Id.* Separating the *Friedrich II* court's definition of "exercising custody rights" into a two-part, conjunctive test, this Court must determine (a) whether Petitioner possessed de jure custody rights at the time of the alleged wrongful retention, and (b) if so, whether he kept or sought to keep any sort of regular contact with his children.

### a. Possession of Custody Rights

The Hague Convention provides three sources of custody rights: (1) operation of law, (2) judicial or administrative decision, or (3) an agreement having legal effect under the law of that state. *See* Hague Convention art. 3. The Court has already determined, pursuant to the Letters Rogatory from the Caracas trial court, that Petitioner did possess custody rights of the children at the time of retention.

### b. Regular Contact

 Having found Petitioner was in possession of custody rights, the Court must now determine whether Petitioner kept or sought to keep regular contact with his children at the time of the alleged wrongful retention. "[I]f a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to 'exercise' those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child." *Friedrich II*, 78 F.3d at 1066.[5] Were the Court to investigate "whether the parent exercised the custody rights well or badly," such an examination would precariously "go to the merits of the underlying custody dispute and beyond the subject matter jurisdiction of the federal courts." *Id.* (citing 42 U.S.C. § 11601(b)(4)).

 Applying this standard, the *Friedrich II* court found that the petitioner did not unequivocally abandon his son because (1) the day after the petitioner and his wife separated, he phoned his wife to arrange a visit with his son, and (2) both parents agreed to the petitioner's "immediate visitations" of their son and scheduled the first visit, only to have the petitioner's wife and their son leave Germany for America without informing her husband that she was doing so. *Friedrich II*, 78 F.3d at 1066–67. In the case *sub judice*, the Court finds that Petitioner, though sleeping in a different residence from his wife and the children while in Florida, visited the children each morning, had dinner with them each evening, and stayed with them in Aruba. After Petitioner returned to Venezuela, he maintained regular contact with the children through daily phone calls, visits every two or three weeks, and several vacation trips. Based on Petitioner's actions, the Court finds Petitioner not unequivocally abandon his custody rights to the children, but rather was exercising these rights at the time of retention.

Having thus established the three elements of the prima facie case, the Court concludes that Respondent's retention of the children on January 11, 1999 was wrongful.

### C. Affirmative Defense: Acquiescence

 Under the Hague Convention, however, the Court's inquiry does not end upon finding wrongful retention or removal. Once Petitioner establishes that wrongful retention "has occurred, the children must be returned ... unless Respondent[ ] established that any of the Hague Convention's affirmative defenses apply." *Lops*, 140 F.3d at 945 (citing 42 U.S.C. § 11603(e)(2), and *Friedrich II*, 78 F.3d at 1067). These affirmative defenses are as follows: (1) the proceeding was commenced more than one year after the re-

---

**5.** The *Friedrich* court noted that "the situation would be different if the country of habitual residence had a legal rule regarding the exercise of custody rights clearly tied to the Hague concept of international removal." *Friedrich,* 78 F.3d at 1066 n. 6. In *Friedrich,* no such legal rule in Germany, the country of habitual residence, existed at the time of the court's decision. *See id.* Similarly, no such legal rule exists in Venezuela.

moval of the child; (2) the children have become settled in their new environment; (3) the person seeking return of the child consented to or subsequently acquiesced in the removal or retention; and (4) there is a grave risk that the return of the children would expose them to physical or psychological harm. *See* Hague Convention arts. 13(a)–(b); 42 U.S.C. §§ 11603(e)(2)(A)–(B). In its singular determination that the children were not well settled and that the children be returned, the *Lops* court did not generally discuss the construction of the Hague Convention's enumerated Article 13 affirmative defenses. *See Lops,* 140 F.3d at 945–46 (discussing only one of the four affirmative defenses). However, other courts have considered the affirmative defenses to be "narrow" and "not a basis for avoiding return of a child merely because an American court believes it can better or more quickly resolve a dispute." *Friedrich II,* 78 F.3d at 1067 (citing *Rydder v. Rydder,* 49 F.3d 369, 372 (8th Cir. 1995) (citation omitted)). "In fact, a federal court retains, and should use when appropriate, the discretion to return a child, despite the existence of a defense, if return would further the aims of the Convention." *Friedrich II,* 78 F.3d at 1067 (citing *Feder,* 63 F.3d at 226 (citing Pub. Notice 957, 51 Fed.Reg. 10494, 10509 (1986))); *see also Wanninger v. Wanninger,* 850 F.Supp. 78, 81 (D.Mass.1994) (citing *Levesque v. Levesque,* 816 F.Supp. 662, 667 (D.Kan.1993)).

### a. Acquiescence Is Subjective

 Respondent argues that Petitioner consented to or subsequently acquiesced in the wrongful retention of their children and should therefore be afforded the third of the foregoing affirmative defenses under Article 13. In order for her to prevail, Respondent must show by a preponderance of the evidence that Petitioner consented to or subsequently acquiesced to the children remaining in the United States. *See Friedrich II,* 78 F.3d at 1067 (citing Hague Convention art. 13(a) and 42 U.S.C. § 11603(e)(2)(B)). The *Friedrich II* court held that "acquiescence under the Convention requires either: an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written enunciation of rights; or a consistent attitude of acquiescence over a significant period of time." *Friedrich II,* 78 F.3d at 1070. "Subsequent acquiescence requires more than an isolated statement to a third-party. Each of the words and actions of a parent during the separation are not to be scrutinized for a possible waiver of custody rights." *Id.* (citing *Wanninger,* 850 F.Supp. at 81–82).

In *Friedrich II,* the court rejected the respondent's argument that petitioner acquiesced. *See Friedrich II,* 78 F.3d at 1069–70. Arriving at its conclusion, the *Friedrich II* court weighed contradictory testimonial evidence by the parties as to whether petitioner told his wife that he consented to the removal of their children. *See id.* at 1069. In absence of other evidence, the *Friedrich II* court relied on the respondent's unannounced, "deliberatively secretive" departure from the habitual residence and ignored statements the petitioner allegedly made to third parties. *Id.* (finding that the "deliberatively secretive nature of her actions is extremely strong evidence that Mr. Friedrich would not have consented to the removal of" their child).

Courts in the United States, England, and France have found acquiescence to be a subjective test. The English House of Lords held, "Acquiescence is a question of the actual subjective intention of the wronged parent, not of the outside world's perception of his intentions." *Re H and Others,* (1997) 2 W.L.R. 563, 573B (citing *Friedrich II,* 78 F.3d at 1060; *Wanninger,* 850 F.Supp. at 78; and *Horlander v. Horlander,* 1992 Bull.Civ. I, No. 91–18.177).[6]

---

**6.** Rejecting "any construction of art 13 [of the Hague Convention] which reflects purely English law rules as to the meaning of the word acquiescence," the English House of Lords stated, "An international convention expressed in different languages and intended to apply to a wide range of differing legal systems, cannot be construed differently in different jurisdictions." *Re H and Others,* (1997) 2 W.L.R. 563, 573B.

In *Horlander*, the high court in France found that acquiescence is subjective and refused to find acquiescence where the petitioner's intention to acquiesce was not "unequivocal." *Horlander*, 1992 Bull.Civ. I, No. 91–18.177. In *Wanninger*, a Massachusetts district court significantly discounted circumstantial evidence of acquiescence, once the court established that the petitioner's intentions were not to acquiesce, but to reconcile his marriage. *See Wanninger*, 850 F.Supp. at 82 (de-emphasizing letters petitioner wrote to third party and relying on petitioner's statements and letters of reconciliation made to his wife). This Court likewise finds acquiescence to be a question of subjective intent.

### b. Reconciliation

Courts examining the tension between reconciliation and acquiescence have been careful not to confuse the former for the latter. *See Wanninger*, 850 F.Supp. at 81–82 (finding no acquiescence where petitioner wrote letter of reconciliation to his wife, agreed to their children's stay outside habitual residence during reconciliation period, and kept in continual contact with his wife and children by writing letters and calling on telephone); *see also Horlander*, 1992 Bull Civ. 91–18.117 (finding that "consent to the non-return merely based on the temporary agreement given in order to reach an amicable settlement, which did not work out" was not probative of an "unequivocal" intention to acquiesce); Linda J. Silberman, *Hague Convention on International Child Abduction: A Brief Overview and Case Law Analysis*, 28 Fam.L.Q. 9, 26 (1994) (reasoning that "as a general rule courts should be careful not to translate negotiation as acquiescence" because doing so "could lead lawyers to refuse to or negotiate at all for fear of creating the impression of acquiescence, and could encourage litigation at the expense

of a more amiable resolution"). The British House of Lords agrees. *See Re H and Others*, (1997) 2 W.L.R. 563, 573B (refusing to characterize marital negotiations as acquiescence). The petitioner and respondent in *Re H and Others* were orthodox Jews who were "obligated, in the event of a dispute between the two members of the community, to appeal to a 'Beth Din,'" a religious court. *Id.* Therefore, the petitioner was slow to pursue remedies under the Hague Convention because he was attempting to resolve his marital dispute through the Beth Din. *See id.* The House of Lords determined that the petitioner's effort to reconcile or resolve, as it were, his marital dispute through the Beth Din does not mean he acquiesced to the wrongful removal of his children under the Hague Convention. *See id.*

Furthermore, Article 12 of the Hague Convention provides a one-year statute of limitations from the time of the wrongful removal or retention. This limitations period indicates, amongst other things, the intention of the Convention's framers to afford husbands and wives ample time to reconcile their differences. *See Parental Kidnapping: Hearing on H.R.1290 Before the Subcomm. on Crime of the House Comm. of the Judiciary*, 96th Cong., 2d Sess. 103–04 (1980) (statement of Doris Jonas Feed, Chairperson, ABA Family Law Section's Custody Comm. and Comm. on Research and Statistics) (arguing law should allow aggrieved parent to act "immediately" once abduction has occurred).[7] Petitioner *sub judice* filed his Petition for the Return of the Children before the statute of limitations had expired, albeit seven months after the date of wrongful retention. Courts have not found acquiescence, where the petition for the return of the child was filed shortly after the abduction or where the petitioner vigorously at-

---

7. In December 1980, Congress enacted the Parental Kidnapping Prevention Act, 28 U.S.C. § 1738A (1980) to complement the Uniform Child Custody Jurisdiction Act, 19 M.R.S.A. § 801, *et seq.* (1968). The framers of the Hague Convention relied upon the ex-

periences of the Hague Conference on Private International Law's 29 member states, including the United States. *See* Richard D. Kearney, *Development in Private International Law*, 81 Am.J. Int'l L. 724, 731 (1987).

tempted to seek custody of his child through other means shortly thereafter the abduction. *See, e.g., Friedrich II,* 78 F.3d at 1070 (finding no acquiescence where, *inter alia,* petitioner both obtained order awarding him custody 21 days after abduction and filed petition for return of child less than two months after abduction); *Wanninger,* 850 F.Supp. at 81–82 (finding no acquiescence where, *inter alia,* petition was filed within three months of wrongful removal and within few days of learning that petitioner's marriage was irreconcilable); *Freier v. Freier,* 969 F.Supp. 436, 444 (E.D.Mich.1996) (finding no acquiescence or consent where, *inter alia,* petition was filed within days of wrongful removal); *Zarate v. Perez,* No. 96–C50394, 1996 WL 734613, *3 (N.D.Ill. Dec.23, 1996) (finding no acquiescence or consent where, *inter alia,* petitioner sought assistance through Central Authority of Mexico to obtain return of child "[s]hortly" after wrongful retention); *David S. v. Zamira S.,* 151 Misc.2d 630, 636, 574 N.Y.S.2d 429, 433 (Fam.Ct.1991) (finding no acquiescence where petition was filed two months after wrongful removal, though judicial proceedings did not commence for another 12 months). With the exception of *Wanninger,* 850 F.Supp. at 81–82, however, none of these cases involved post-abduction attempts at reconciliation. When a petition for the return of the children is filed prior to the end of the statutory period, courts will find acquiescence in only a limited set of scenarios. *See Friedrich II,* 78 F.3d at 1067. Reconciliation has historically not been one of them. *See, e.g., Wanninger,* 850 F.Supp. at 81–82; *Horlander,* 1992 Bull Civ. 91–18.177; *Re H and Others,* (1997) 2 W.L.R. 563, 573B. Therefore, the Court finds the timely filing of the Petition, after six months of serious and concerted efforts at reconciliation, is not evidence of acquiescence.

The parties dispute whether Petitioner's behavior during the period between January 11, 1999 and June 18, 1999 is probative of acquiescence or reconciliation. For instance, Petitioner provided his wife and children with a $7,000.00 monthly stipend and tuition for the children's new school in Florida. Respondent contends that this conduct by Petitioner evinces acquiescence, but Petitioner argues that his on-going financial support ran concurrently with his effort to reconcile their marriage. Petitioner maintains that he did not want to file for marital dissolution, custody, or for the children to be returned to Venezuela during this six-month period because he feared that doing so would undermine his attempt at reconciliation and would "torment" the children.

In addition to Petitioner's testimony explaining that he was attempting to reconcile his marital relationship until June 18, 1999, the letter he mailed to Respondent on June 8, 1999 documents his desire to reconcile their conjugal relationship. In light of this letter, along with the testimony of Petitioner at the evidentiary hearing and the immediate filing of a divorce custody proceeding in Venezuela upon notification that reconciliation had failed, the Court finds that Petitioner's tuition and monthly stipend payments to Respondent and his transfer of the children's clothing to Florida do not demonstrate Petitioner's unequivocal intention to acquiesce, *see Horlander,* 1992 Bull Civ. I, No. 91–18177, much less "an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written enunciation of rights; or a consistent attitude of acquiescence over a significant period of time." *Friedrich II,* 78 F.3d at 1069–70 (finding petitioner's letter did not evidence acquiescence); *Wanninger,* 850 F.Supp. at 82 (relying on petitioner's letters of reconciliation written to his wife). Had Petitioner subsequently acquiesced to the children remaining in the United States, Respondent would not have needed to preclude their summer visit to Venezuela on June 18, 1999 or secrete them from Petitioner. Moreover, the parties planned for their children's return to Venezuela in order to begin school in Caracas, for the 1999–2000 school year. The Court therefore finds that Petitioner's actions during

this critical period between January 11, 1999 and June 18, 1999 illustrate his singular intention to reconcile his marriage.

These efforts to reconcile immediately ceased once Petitioner learned that his wife had filed divorce proceedings in Florida and that their relationship was irreconcilable on June 18, 1999. Following that date, Petitioner filed for divorce immediately in Venezuela on June 19, 1999 and subsequently filed his Petition for the Return of the Children six weeks later. Applying either an objective or subjective standard for acquiescence, the Court finds that Petitioner did not acquiesce. As such, the Court finds that Respondent has not demonstrated by a preponderance of the evidence that Petitioner acquiesced in the retention of the minor children in the United States.

### V. Conclusion

In summation, the Court finds Respondent wrongfully retained the children in the United States on January 11, 1999. The Court arrives at this conclusion because Venezuela was the children's habitual residence immediately prior to January 11, and Petitioner was exercising custody rights on that date. Furthermore, the Court finds Petitioner's efforts at reconciliation do not demonstrate that Petitioner consented to or subsequently acquiesced in the wrongful retention. Accordingly, it is

**ORDERED AND ADJUDGED** as follows:

1. Petitioner Steven Mishkin Pesin's Petition for the Return of the Children is **GRANTED.**

2. Respondent Maria Teresa Osorio Rodriguez's Motion to Dismiss or Abate is **DENIED.**

3. Petitioner and Respondent's two minor children [8] shall be **RETURNED** to Venezuela on or before December 26, 1999 with Respondent should she wish to accompany them.

4. Should Respondent prove unwilling to accompany the children back to Venezuela in keeping with this Order, the children shall be **RETURNED** to Venezuela with Petitioner.

5. Respondent shall not remove the two minor children from the Southern District of Florida pending their return to Venezuela.

6. This case is **CLOSED.** All pending motions not otherwise ruled upon by separate order are **DENIED** as moot.

---

8. To protect the privacy of the two minor children, the Court omits their names from this Order. Accompanying this Order is a sealed order granting the Petition for the Return of the Children and invoking the names of the children.