**Teofilo M. MENDEZ LYNCH, Petitioner,**

v.

**Cathleen M. MENDEZ LYNCH, now known as Cathleen Mary Pizzutello, Respondent.**

No. 2:01–CV–371FTM29DNF.

United States District Court, M.D. Florida, Fort Myers Division.

Aug. 13, 2002.

Rana Holz, Rubinstein & Holz, P.A., Ft. Myers, FL, for plaintiff.

Patricia M. Lee, Law Office of Patricia M. Lee, St. Petersburg, FL, for defendant.

## OPINION AND ORDER

STEELE, District Judge.

This matter comes before the Court on Teofilo M. Mendez Lynch's ("Petitioner") Petition for the Return of Children. (Doc. # 1). Petitioner alleged that his former wife and the mother of his two children, Cathleen M. Mendez Lynch, now known as Cathleen Mary Pizzutello ("Respondent"), wrongfully removed their two children from Argentina and has wrongfully retained them in the United States. The Petition was filed pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11670 (the "Hague Convention"), as implemented by the International Child Abduction Remedies Act, 42 U.S.C. §§ 11601–11610 ("ICARA"). Respondent filed an Answer and Affirmative Defenses (Doc. # 11), and the Court conducted a non-jury trial on August 1, 2, 5, 7, 8, and 9, 2002.

## I. Findings of Fact

### A. Background:

Petitioner, a citizen of Argentina, and Respondent, a citizen of the United States, met in California and were married in a civil ceremony in Los Angeles, California on March 29, 1988. On April 8, 1988, they were married in a religious ceremony in Buenos Aires, Argentina attended by family members of both parties. The marriage by all descriptions was stormy from the beginning, and included at least one separation while they lived in California.

In December, 1991, the couple moved permanently to the Provence of Buenos Aires, Argentina. Respondent applied for, and on October 21, 1992 received, resident alien status in Argentina. Petitioner was employed by the Toro Company in a well-paying position, and the couple enjoyed a high standard of living in affluent areas of Buenos Aires. The family also belonged to Club Nautico, a private sailing and recreational club.

Two children were born in Argentina during the marriage. Dylan Teofilo Mendez Lynch (Dylan) was born on June 27, 1993, and is currently nine (9) years old. Brandon Martin Mendez Lynch (Brandon) was born on December 19, 1995, and is currently six (6) years old. Both children enjoy dual citizenship in the United States and Argentina.

Petitioner's job with Toro required frequent travel, usually each month. On occasion he would meet his family at various locations to combine vacations with his business travel. The family employed a maid at their residence, who traveled with them on their frequent trips. Under Argentine law, children cannot travel outside the country without both parents or the consent of the absent parent. Shortly after the birth of each son, Petitioner executed official documents in Argentina granting permission for Respondent to travel outside Argentina with the child without his presence or the necessity of further permission. Respondent's Exhibits GGG, HHH. This was done to facilitate the family's frequent travel, and was common in the social circle in which they functioned.

The couple's marital difficulties continued, and Petitioner was separated from his wife from February, 1996 to January, 1997. The couple reconciled, but the marriage relationship continued to deteriorate, and there were numerous verbal fights despite frequent joint counseling. Petitioner testified that there was never any physical contact, but Respondent testified there were many physical confrontations. Respondent testified that Petitioner slammed a door into her, held her down, spit on her, placed his hands around her neck, pushed and "smacked" her, and threw things at her. There is no claim that either child was ever physically abused by either parent. Respondent testified that in addition to his frequent business travel, Petitioner would periodically take unannounced trips of indefinite duration to "his favorite countries."

In April, 1999, the family moved to the Country Club Martindale in Pilar, Argentina, about an hour from Buenos Aires. The couple designed and built a house at the Carmel Country Club, a guarded, gated community in Pilar, moving in on or about October 1, 1999.

The parties began to discuss divorce, and separated amicably on or about November 1, 1999. Petitioner left the marital home to reside nearby in a house which included his Toro Company office. During

the separation, Petitioner frequently saw his children, either at the marital home or at his office/home. During the separation Petitioner paid all the household bills for the family and the marital home, and provided Respondent with a credit card for her use. The couple initially saw a husband and wife team of attorney/mediators, but the efforts at reconciliation were unsuccessful. Two other attorneys in Argentina were consulted, also without success.

## B. Petitioner's Trip to India:

The catalyst for the current litigation began in December, 1999, while the parties were separated. In Argentina, early December is the beginning of the school summer vacation. Petitioner testified he decided it was a good time to take an extended vacation while he and his wife were separated and the children were out of school, and decided to go to India. According to Petitioner, he told Respondent before the trip the exact date and flight times of his departure (January 1, 2000) and return (January 20, 2000), as well as an e-mail address; he could not give precise locations in India due to the uncertainty of his travel plans in that country. Petitioner intentionally did not tell Respondent that he was meeting his girlfriend in India and would be traveling with her. Petitioner pre-paid all bills, left cash ($950) for the family, and left a credit card for emergencies. Petitioner testified the family could also eat and shop at the store in their community center and place the purchases on their account, as was normally done.

Respondent's version of Petitioner's departure plans is significantly different. She testified that Petitioner "abandoned" the family, telling her he was going either to China or India to "find his spirit." Respondent concedes Petitioner informed her when he would be leaving, but testified he did not tell her when he was returning and left no way to contact him. Respondent testified Petitioner left an insufficient amount of cash ($600) and a credit card which by then was already at its limit.

Three relevant events occurred in December prior to Petitioner's departure. Sometime in the middle of the month Respondent took the two children to a resort at the beach in Argentina for a few days for rest, using the credit card given her by Petitioner.

On December 28, 1999, Respondent went to the Police Department for Women in Martinez, Argentina and filed a complaint about Petitioner. Respondent's Exhibit FFF. Respondent asserted in the complaint that Petitioner had left the marital home on November 1, 1999; that she had suffered verbal and physical aggression for the past three years; that she could no longer cope with the situation; and that she desired that Petitioner be called upon for his response so she could take her children out of the country with his authorization, since all her family was in the United States and he left her alone with the minor children.

Petitioner took his children to a New Year's Eve party on December 31, 1999, for the new millennium. Petitioner spent that night with them before leaving for India.

Petitioner left for India on January 1, 2000. Petitioner testified he called home for his children when he reached London, England.

## C. Respondent's Departure From Argentina:

Respondent testified that she became concerned Petitioner might not return

from the trip when Petitioner's·boss called and did not know he had gone. Respondent contacted Petitioner's secretary, who said she could provide no information. Respondent called friends and family, eventually learning that Petitioner was traveling in India with a girlfriend. Respondent testified that Petitioner's best friend advised her that he was concerned Petitioner might commit suicide, and she began receiving threats from people looking for Petitioner in connection with Petitioner's nefarious business dealings, stolen money, and misconduct at Toro.

Petitioner testified that he called home on January 10, 2000, to speak with his children. He testified he got into an argument with his wife, who by then had found out about the girlfriend and would not let him speak with his children.

Respondent testified that by January 15 or 16, 2000, she decided to leave Argentina with the two children. She stored a few household items belonging to Petitioner's family, shipped some items, and sold or donated everything else in the house, including the refrigerator. The maids were discharged; Respondent tried to take the family dog with her, but found she could not do so. Respondent testified she had no idea how long she would be gone at the time she left; she left the house virtually empty, and left no communication for her husband as to the whereabouts of herself or their children.

On January 19, 2000, Respondent left Argentina with the two children. Because Brandon's Argentina passport had expired, Respondent took the two children first by ferry to Uruguay, where they were able to fly to Miami, Florida using their United States passports. Joint Exhibits 2, 3. Respondent received the tickets as gifts from the pastor of her church in Argentina, Randall Bargerstock.

## D. Petitioner's Return to Argentina:

Petitioner returned to Argentina from India on the morning of January 20, 2000. He went to the marital home to see his children, and found it completely empty. Petitioner went to his office/house, and essentially bombarded his friends and acquaintances with calls in an effort to find what had happened to his wife and children. He discovered that Respondent had been "raging" to people about him, had taken everything, and had left for places unknown with the children.

On January 21, 2000, Petitioner went to the police department and filed a missing persons and robbery complaint, then began to conduct his own investigation to find his children. Petitioner called the airlines and immigration department. Petitioner was advised by immigration officials to revoke his prior written permission for his children to travel without his presence, and did so on January 25, 2000. Petitioner's Exhibit 42. Petitioner called friends, his secretary, Pastor Bargerstock, his maid, and others in an attempt to locate his wife and children. Pastor Bargerstock eventually told Petitioner that his wife was fine, but would not tell him anything more. The pastor agreed to e-mail Respondent for him.

Petitioner eventually discovered that his wife had taken the children to Uruguay. Petitioner then began calling airlines in Uruguay to see if his wife and children had left or were leaving for the United States. Petitioner also contacted the International Police (Interpol) to report the parental kidnaping, and was eventually informed of the dates his wife had left with the children.

Also upon his return from India, Petitioner found he was in trouble with his

employer. His immediate supervisor asserted he did not know Petitioner was going on vacation for three weeks. During the course of trying to find Petitioner, his supervisor discovered a number of work-related problems which led to a decision to terminate Petitioner's Employment Agreement with Toro Company. One of the reasons stated for the termination, although a relatively minor one, was that Petitioner had taken an unauthorized extended vacation to India. Petitioner denies any misconduct related to his work or otherwise, and introduced several e-mails to his supervisor and other superiors at Toro stating that he would be on vacation from Monday, January 3, 2000 through January 19, 2000. Petitioner's Exhibit 20.

**E. Respondent in Florida:**

Pastor Bargerstock had arranged for Respondent and the two children to stay in a home belonging to the Vazquez family on Plumosa Avenue in Fort Myers. They arrived at this address on January 21, 2000.

Mr. Vazquez testified by Affidavit that a person from his church asked him to lend his house to a woman who had family problems and needed time to rest for a couple of weeks with her two children. Mr. Vazquez, who was in Buenos Aries at the time, agreed. Mr. Vazquez returned to the United States in February, and on February 5, 2000, asked Respondent how much more time she would require. Her response was vague, and Mr. Vazquez returned to Buenos Aires.

In February, 2000, Petitioner learned Respondent was living with the Vazquez family somewhere in Florida, but did not know which city. Petitioner called every Vazquez in Miami, Florida, trying to find her, but did not think to call the Fort Myers area.

On February 8, 2000, Respondent sent Petitioner the first of a series of e-mails. Petitioner's Exhibit 14; Respondent's Exhibit MMM. Respondent stated she had heard Petitioner was anxious about the boys, and characterized her situation as "vacation time." Respondent stated that she did not want to reveal her "vacation location" because she was fearful Petitioner would interfere and interrupt her time with the children and away from him.

In a February 10, 2000 e-mail, Petitioner asked for Respondent's location and when she would return, since the school year was beginning on March 6. Respondent responded on February 25, 2000, that they were on "the vacation we have always wanted," and declined to speculate when they would return to Argentina, saying "As for us returning well God got us this far we are in his hands." Petitioner's e-mails continued to seek information as to Respondent's location and the return of the children for the start of school.

Respondent testified that by March, 2000, she decided for the first time not to return to Argentina with the children and to stay in Florida. In a March 7, 2000, e-mail, Respondent stated that she intended to convince Petitioner to see the advantages of the boys living in Florida, and on March 8, 2000, e-mailed an extensive list of advantages to living in Florida and disadvantages of living in Argentina.

By the first week of March, 2000, Respondent had given Mr. Vazquez no further information, so he contacted her. Respondent promised to give him a response within a week. Mr. Vazquez called her again, but her response was ambiguous. Mr. Vazquez asked her to leave the house

by March 31, 2000, "in view of her attitude." On April 2, 2000, he returned to his house and found it empty. Petitioner's Exhibit 9. Respondent testified that on or about April 2, 2000, she and the children left the Vazquez residence and moved into the Abuse Counseling and Treatment (ACT) Shelter, a shelter for abused women, in Fort Myers. Because of the nature of the shelter, its address is kept confidential.

Just prior to April 2, 2000, Petitioner learned from Pastor Bargerstock that Respondent was in the Fort Myers, Florida area, but did not know precisely where. Petitioner receive a letter dated April 3, 2000, from ACT demanding, among other things, that the children stay in the United States. (Doc. # 1, Exhibit C). Petitioner's response was that the children must be returned to Argentina so the custody proceedings could be determined by the courts in Argentina. (Doc. # 1, Exhibit D). In an April 5, 2000, e-mail, Respondent stated that "I can go underground at any moment and there is a lot of support to change our identies (sic) and start REALLY over."

On May 3, 2000, while still at the ACT shelter, Respondent filed a Petition for Injunction For Protection Against Domestic Violence, a Request for Confidential Filing of Address, and a Uniform Child Custody Jurisdiction Act (UCCJA) Affidavit in the Circuit Court of the Twentieth Judicial Circuit in and for Lee County, Florida. Respondent's Exhibit B. The Affidavit listed that the address of both children from January through May, 2000 as "Confidential Address, with [the mother]" and listed the mother's address as "Confidential." On the same date, an *ex parte* Temporary Injunction for Protection Against Domestic Violence was issued.

Petitioner's May 3, 2000, e-mail indicated he knew Respondent and the children were living in an abuse shelter, and expressed dismay. He argued that Respondent's "vacation" had turned into a "kidnaping," and gave Respondent two days to provide an address or telephone number so he could speak with his children and confirm the date of her return to Argentina. Otherwise, Petitioner said he would go forward with the procedure (the Hague Convention) to bring the children back to Argentina. On May 5, 2000, Respondent e-mailed that she was willing to talk about things, and several e-mails were exchanged over the following week. In May 12 and May 17, 2000 e-mails, Petitioner repeated his demand for an address and telephone number, conversation with his children, and confirmation of the date of their return. In a May 18, 2000 e-mail, Respondent said she was moving the next day, and could not afford more calls to Argentina. Petitioner's May 20, 2000 e-mail provided ways to contact him, and again requested that the children come home.

On May 24, 2000, Respondent and the two children left the ACT shelter and moved into a house provided by a church member on Sunrise Avenue in Fort Myers.

Respondent did not provide her address or telephone number to Petitioner, and did not return the children to Argentina. Therefore, on May 31, 2000, Petitioner filed a petition with the Central Authority in Argentina to implement Hague Convention proceedings.

Petitioner's e-mails demanding to speak with his sons and that they be returned to Argentina continued in June, 2000. On June 19, 2000, Respondent gave Petitioner a commercial post office box in Fort Myers if he wanted to send money or gifts, but

the communication between Petitioner and Respondent continued by e-mail. By the end of June, Petitioner was still complaining about a lack of a telephone number to speak with his children and the lack of an address to see them. On July 7, 2000, Respondent sent a lengthy e-mail saying she was going to block anymore e-mail access by him, and perhaps take more radical steps to change her identity. Thereafter, the e-mail communication was sporadic, although Petitioner continued to request his children be returned.

On June 27, 2000, the United States Department of State, acting as the United States Central Authority under the Hague Convention, sent Respondent a letter advising that it had been requested by the government of Argentina to assist in the return of the two children pursuant to the Hague Convention. The letter requested that Respondent consider voluntarily agreeing to return the children to Argentina in order to avoid the initiation of legal proceedings by Petitioner under the Hague Convention in the United States. After summarizing the Hague Convention provisions, the letter advised that if they did not hear from her by July 6, 2000 or if she elected not to return the children, the U.S. Department of State would facilitate the initiation of judicial proceedings to obtain the return of the children. Respondent's Exhibit A.

On August 1, 2000, Respondent and the two children moved to a house on Old Bridge Road in North Fort Myers.

Against the advice of his Argentina attorney, Petitioner made plans to travel to the United States in November, 2000, to

try and see his children, and advised his wife that he was coming. On November 6, 2000, the day Petitioner arrived in the United States, Mrs. Mendez Lynch filed a Petition for Dissolution of Marriage in the Lee County Circuit Court prepared by an attorney with the Lee County Legal Aid Society, Inc. Petitioner's Exhibit 2; Respondent's Exhibit A.[1] In listing the addresses of the children for the prior five years, the Petition gave the two most recent address as being with the mother and as "Confidential." Mrs. Mendez Lynch stated she was without sufficient money or means to completely support herself and the children, and was in need of child support, health care insurance, day care costs, and the payment of attorney fees and costs. Respondent made arrangements for Petitioner to watch the two boys at a soccer game, and then took him to her house on Old Bridge Road to visit with the boys. While at the house, Petitioner was served with the Summons in the divorce proceedings. Petitioner continued to inform his wife that he wanted their children to return to Argentina.

At the wife's request, a Default was entered on November 28, 2000 when Teofilo did not answer the divorce petition.

Petitioner also traveled to the United States in December, 2000 for Christmas. During this visit he was served with the domestic violence petition and temporary injunction. On January 17, 2001, after Petitioner returned to Argentina, a Final Judgment of Injunction for Protection Against Domestic Violence was issued.

In January, 2001, Respondent moved again, this time to a house on Candle

---

1. The divorce petition uses Petitioner and Respondent to refer to the opposite parties as in this case. For consistency, the Court will continue to refer to Mr. Mendez Lynch as Petitioner and Ms. Pizzutello as Respondent.

Drive. Respondent did not give Petitioner her new address, but used the commercial post office box.

On February 1, 2001, Mrs. Mendez Lynch filed a Motion to Allow Wife to Temporarily Remove Children From Lee County, Florida in the divorce proceedings. Petitioner's Exhibit 3. This motion requested that the court's Standing Order precluding the removal of children from their current county of residence without the written agreement of both parents or a court order be amended to allow her to visit her parents in New Jersey for 7–10 days with her children.

On March 16, 2001, current counsel for Petitioner, at the request of the Consulate General of the Republic of Argentina, filed a motion to continue the divorce case as it related to the children based upon the Hague Convention. This motion was denied. A final judgment of divorce was entered on May 15, 2001, by the Honorable Hugh E. Starnes giving Respondent sole and primary residential responsibility and supervised visitation to Petitioner. The judgment was without prejudice to Petitioner's rights under the Hague Convention. Exhibit A.

In May, 2001, Petitioner moved to a mobile home provided by a church member and largely paid for by the church.

On June 8, 2001, Mrs. Mendez Lynch filed à Motion to Allow Removal of Minor Children From Lee County, Florida in the divorce proceedings. Petitioner's Exhibit 4. The motion reported that the former Mrs. Mendez Lynch expected to complete school as a massage therapist in August, 2001, and had arranged employment in

Colorado upon the completion of the schooling. She requested permission to re-locate to Colorado with her two children. The motion was signed by her *pro se*, but she whited out her address and telephone number on the copy sent to Petitioner.

The instant Hague Convention petition was filed in federal court on June 29, 2001. (Doc. # 1). With the agreement of both parties, the Court has taken judicial notice of the contents of the court file.

On July 30, 2001, Judge Starnes deferred all substantive matters relating to the custody of the children until the Hague Convention petition filed in federal court was determined. Respondent's Exhibit A. On October 4, 2001, Judge Starnes approved a written stipulation concerning visitation by Petitioner with his children. A mediation session on December 19, 2001, in the state proceedings was unsuccessful.

Additional facts will be set forth below as necessary to resolve specific issues.

## II. Legal Principles

To address the harm done to children[2] by international parental kidnaping, the Hague Convention is designed to restore the factual status quo and protect the legal rights of the non-abducting parent. The stated objectives of the Hague Convention are (1) to "secure the prompt return of children wrongfully removed or retained in any Contracting State," and (2) to "ensure that rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States." *Lops v. Lops,* 140 F.3d 927, 935 (11th Cir.1998), quoting the Hague Con-

---

**2.** The Hague Convention effectively defines "children" as being under 16 years of age. When a child attains the age of 16 years, the Hague Convention ceases to apply. Hague Convention, Article 4.

vention, Art. 1, §§ a–b; *Bekier v. Bekier*, 248 F.3d 1051, 1053 (11th Cir.2001). Thus, a court considering a petition for the return of a child under the Hague Convention and ICARA "has jurisdiction to decide the merits only of the wrongful removal claim, not of any underlying custody dispute.... The Hague Convention is intended to 'restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court.'" *Lops*, 140 F.3d at 936, quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1064 (6th Cir. 1996).

The Hague Convention mandates the return of children to their circumstances prior to the abduction if one parent's removal or retention violated the custody rights of the other parent and was therefore "wrongful." Hague Convention, Article 12; 42 U.S.C. § 11601(a)(4). The removal or retention of a child is "wrongful" where it (1) violates the "rights of custody" of the non-abducting person "under the law of the State in which the child was habitually resident immediately before the removal or retention," and (2) the rights of custody were actually being exercised at the time of the removal or retention, or would have been exercised but for the removal or retention. Hague Convention, Article 3; *Lops*, 140 F.3d at 936 (citations omitted). Therefore, a petitioner establishes the elements of wrongful removal or retention by demonstrating by a preponderance of the evidence[3] that: (1) the habitual residence of the child immediately before the date of the allegedly wrongful removal or retention was in the country to which return is sought; (2) the removal or retention breached the petitioner's custody rights under the law of the child's habitual resi-

dence; (3) the petitioner was actually exercising or would have been exercising custody rights of the child at the time of his or her removal or retention; and (4) the child has not attained the age of 16 years. *Lops*, 140 F.3d at 936; *Pesin v. Osorio Rodriguez*, 77 F.Supp.2d 1277, 1284 (S.D.Fla.1999), aff'd 244 F.3d 1250, 1253 (11th Cir.2001). If petitioner meets this burden, the child who is wrongfully removed or retained must be promptly returned. *Lops*, 140 F.3d at 936, citing 42 U.S.C. § 11601(a)(4).

This general rule that a wrongfully removed or retained child must be returned has six exceptions, however, which excuse the return of the child. Hague Convention, Articles 12, 13, 20. A court is not bound to order the return of a child if respondent demonstrates by a preponderance of the evidence[4] that: (1) the person having care of the child was not actually exercising the custody rights at the time of removal or retention, Hague Convention, Article 13a; or (2) the person having care of the child had consented to or subsequently acquiesced in the removal or retention of the child, Hague Convention, Article 13a; or (3) "the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Hague Convention, Article 13, unnumbered paragraph; or (4) the proceedings were commenced more than one year after the date of the wrongful removal or retention and "the child is now settled in its new environment." Hague Convention, Article 12. Additionally, a court is not bound to order the return of a child if respondent demonstrates by clear and convincing evi-

---

**3.** 42 U.S.C. at § 11601(e)(1)(A).

**4.** 42 U.S.C. at § 11601(e)(2)(B).

dence[5] that: (5) there is a grave risk that the child's return would "expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, Article 13b; or (6) return of the child would not be permitted by fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms. Hague Convention, Article 20. Even if an exception is established, the Court has discretion to order the return of a child if return would further the aims of the Hague Convention. *Miller v. Miller*, 240 F.3d 392, 402 (4th Cir.2001); *England v. England*, 234 F.3d 268, 270–71 (5th Cir. 2000); *Friedrich v. Friedrich*, 78 F.3d at 1067; *Feder v. Evans–Feder*, 63 F.3d 217, 226 (3rd Cir.1995).

### III. Application

#### A. Petitioner's Case:

The two threshold issues of any Hague Convention case are not in dispute. The children are under 16 years of age, and Argentina and the United States became signatory to the Hague Convention prior to the removal of the children in this case.

It is also undisputed, and the evidence amply establishes, that the children's habitual residence immediately prior to leaving Argentina on January 19, 2000, was Argentina. Thus, the law of Argentina governs the decision as to whether custody rights existed at the time of removal. *Miller*, 240 F.3d at 401. It is undisputed, and amply supported by the evidence, that Petitioner had "rights of custody" over the children pursuant to Argentine law at the time of removal. The parties agree that the Patria Potestas[6] (parental authority)

in effect in Argentina, Petitioner's Exhibit 6, granted Petitioner "rights of custody" within the meaning of the Hague Convention.

Respondent asserts, however, that Petitioner has failed to establish the removal was "wrongful" within the meaning of Article 3 of the Hague Convention. Respondent argues that the removal was not "wrongful" because (1) she had Petitioner's consent to remove the children from Argentina, and therefore such removal did not violate Petitioner's rights of custody, and (2) the rights of custody, while legally present, where not actually being exercised by Petitioner at the time of removal. Respondent also argues that the retention was not wrongful because the children's habitual place of residence had become the United States at the time of the retention.

#### (1) Petitioner Did Not Consent:

■ Respondent argues that the consent to remove the children from Argentina on January 19, 2000, is evidenced by Petitioner's signed and notarized consent documents for both children executed soon after their births and by the conduct of the parties throughout their marriage. The Court finds that under the facts of this case Petitioner did not consent to the removal of the children on January 19, 2000. The evidence is clear that the written consents to travel were given to facilitate family vacation-related travel, not as consent to unilaterally remove the children from Argentina at the sole discretion of Respondent. The conduct of the parties throughout the marriage was consistent with this understanding of the consent, and Respondent's December 28, 1999 statement to the

---

5. 42 U.S.C. at § 11601(e)(2)(A).

6. For a historical discussion of Patria Potestas, see *Whallon v. Lynn*, 230 F.3d 450, 456–58 (1st Cir.2000).

Women's Police Department confirmed such an understanding.

The Court also rejects Respondent's characterization of her removal of the children as being a "vacation," and thus within the understanding of the consents. Respondent testified that within a few days of deciding to leave Argentina with the children, she had literally emptied the marital home of its contents, including the refrigerator and family dog, discharged the household employees, and left no communication for Petitioner as to the family's whereabouts. Such conduct cannot be fitted within even the broadest definition of "vacation." The Court finds that Petitioner has proven by at least a preponderance of the evidence that he did not consent to the removal of his children from Argentina on January 19, 2000, and that the removal did violate Petitioner's rights of custody under Argentina law and the Hague Convention.

**(2) Petitioner Was Exercising Rights of Custody at Removal:**

■ Respondent also argues that Petitioner was not actually exercising his rights of custody, even though he possessed such rights as a matter of Argentine law. Petitioner has the burden of showing by a preponderance of the evidence that he was exercising custody rights at the time of the removal. *Lops*, 140 F.3d at 936. While the Hague Convention does not define the "exercise" of rights of custody, the Sixth Circuit has stated that "[t]he only acceptable solution, in the absence of a ruling from a court in the country of habitual residence, is to liberally find 'exercise' whenever a parent with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child." *Friedrich*, 78 F.3d at

1065. The court went on to "hold that, if a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to 'exercise' those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child." *Id.* at 1066. *See also Pesin*, 77 F.Supp.2d at 1286–87.

Under this standard, or even one more favorable to Respondent, Petitioner has established he was exercising his rights of custody at the time the children were removed. Petitioner continued to see and visit with the children and participate in their lives during his separation from his wife. Petitioner paid all the bills before leaving for India, including those for the marital home. He provided cash and a credit card to Respondent, and was only gone for nineteen days. While Respondent no doubt felt "abandoned" when she found out Petitioner was traveling with a girlfriend, Petitioner's conduct cannot be characterized as a failure to exercise custodial rights over his children. Under any version of the India trip, the result is not an abrogation of the exercise of parental rights under Argentine law, and there is no evidence that any tribunal in Argentina has so found.

**(3) Habitual Residence At Time of Retention:**

■ Respondent argues that Petitioner has not established that the retention was wrongful because the habitual residence of the children had become the United States. The Court does not agree.

"Under the Hague Convention, the relevant period of habitual residence is that span of time immediately before the date of the alleged wrongful retention." *Pesin*,

77 F.Supp.2d at 1284–85. Accepting Respondent's testimony, she stated that she first decided to stay in Florida with the children in the United States in March, 2000.[7] Her first e-mail to that effect was on March 7, 2000. "Habitual residence" is generally defined as "the place where [the child] has been physically present for an amount of time sufficient for acclimatization and which has a degree of settled purpose from the child's perspective." *Pesin*, 77 F.Supp.2d at 1284 (citing cases). *See also Mozes v. Mozes*, 239 F.3d 1067 (9th Cir.2001). As of March 7, 2000, Respondent and the children had been in Florida for 46 days. Respondent and the children were living in a house which the owner had already asked them to vacate; their next residence was a temporary shelter for abused women. The children had not yet been enrolled in school in Florida. Respondent and the children had very limited financial resources, and were surviving on the generosity of others. The Court finds that as of immediately prior to March 7, 2000, the children were clearly still habitual residents of Argentina, and their retention in the United States violated Petitioner's rights of custody.

The Court concludes that Petitioner has established his case by at least a preponderance of the evidence. Both children are under 16 years of age; the children were habitually resident of Argentina at the time of removal and the time retention began, even when viewed in the light most favorable to Respondent; the removal of the children from Argentina violated Petitioner's rights of custody under Argentina law; the retention of the children in the United States violated Petitioner's rights of custody under Argentina law; and Petitioner was exercising his rights of custody at the time of the removal and the time of retention.

## B. Respondent's Affirmative Defenses:

Respondent asserts that all six exceptions to the required return of the children apply in this case. Each of the exceptions is to be applied narrowly. *Rydder v. Rydder*, 49 F.3d 369, 372 (8th Cir.1995); 42 U.S.C. § 11601(a)(4).

### (1) Not Exercising Rights of Custody:

■ A court is not bound to order the return of a child if respondent demonstrates by a preponderance of the evidence that the person having care of the child was not exercising rights of custody at the time of the removal or retention of the child. Hague Convention, Article 13 a; 42 U.S.C. § 11603(e)(2)(B). The Court has already found that Petitioner has established by a preponderance of the evidence that he was exercising his rights of custody regarding the children at the time of removal and retention. Accordingly, this affirmative defense has not been established by Respondent.

### (2) Petitioner's Consent/Subsequent Acquiescence:

A court is not bound to order the return of a child if respondent demonstrates by a preponderance of the evidence that the person having care of the child had consented to or subsequently acquiesced in the removal or retention of the child. Hague Convention, Article 13 a; 42 U.S.C. § 11603(e)(2)(B). Respondent asserts that

---

7. There is evidence to the contrary. Respondent applied for and received a Florida driver's license on January 21, 2000, the first day she arrived at the house loaned to her. Respondent's Exhibit O.

return of the children is not required because Petitioner consented and/or acquiesced in the removal or retention of the children.

For the reasons set forth above, the Court concludes that Petitioner did not consent to the removal of the children within the meaning of the Hague Convention. Additionally, the evidence clearly shows that Petitioner did not consent to the retention of the children in the United States. Therefore, these aspects of the affirmative defense have not been established.

Respondent also asserts that even if Petitioner did not consent, he subsequently acquiesced in the removal or retention of the children by failure to act upon his rights in a timely fashion and by his agreement for Respondent and the children to attend school in Florida for an indefinite period. The Court disagrees.

"Subsequent acquiescence requires more than an isolated statement to a third-party. Each of the words and actions of a parent during the separation are not to be scrutinized for a possible waiver of custody rights .... acquiescence under the Convention requires either: an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time." *Friedrich*, 78 F.3d at 1070. Under this subjective view of acquiescence, *Pesin*, 77 F.Supp.2d at 1288–89, it is clear that Petitioner never acquiesced to either the removal or retention of the children. Petitioner has consistently asserted that the children should be returned to Argentina.

Even if evaluated from an objective view, there is no objective evidence which would support a finding that Respondent has satisfied her burden. Petitioner "agreed" that Respondent would complete an abuse class in the United States, but the e-mails and testimony clearly established that this class was represented as being for a few weeks and that Petitioner never waivered from his position that the children must be returned to Argentina. Similarly, Petitioner consistently told his children's Florida teachers that he wanted the children returned to Argentina. The Hague Convention encourages the parties to engage in informal discussions prior to initiation of formal proceedings, and that was done by Petitioner in this case. Respondent's argument to the contrary confuses acquiescence with negotiation and attempted reconciliation. *Pesin*, 77 F.Supp.2d at 1289–91. The evidence simply does not support Respondent's acquiescence argument. E.g., *Whallon v. Lynn*, 230 F.3d 450, 461 (1st Cir.2000) (failure to institute formal custody proceedings after leaning spouse was planning on removing child does not itself constitute acquiescence).

### (3) Wishes of the Children:

 A court is not bound to order the return of a child if respondent demonstrates by a preponderance of the evidence that "the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Hague Convention, Article 13, unnumbered paragraph; 42 U.S.C. § 11603(e)(2)(A). This provides a separate and independent basis for a court to refuse to return a child to the country of habitual residency, *Blondin v. Dubois*, 238 F.3d at 166, although like other exceptions it is narrowly applied. *England*, 234 F.3d at 272.

The parties stipulated that at age six Brandon has not attained an age or degree

of maturity to make it appropriate to take his views into account. The Court finds that at age nine, in light of the undisputed testimony, Dylan has attained an age and degree of maturity sufficient to take his opinion into account. The testimony is uncontradicted that Dylan wants to stay in the United States and does not want to go to Argentina. Dylan loves and wants to see his father, but in Florida. Dylan's concerns are with the country of Argentina, not with his father.

The Court concludes that, under the circumstances of this case, Dylan's opinion on return to Argentina is not conclusive. His memories of Argentina are those of a six year old, he has been in the virtually exclusive custody of his mother in the United States since his removal from Argentina, and his mother has articulated a desire not to return to Argentina since almost the beginning of her arrival in Florida. The Court finds that return of Dylan to Argentina would further the aims of the Hague Convention, and therefore will exercise its discretion to so order despite Dylan's view.

### (4) Children Well–Settled in New Environment:

■ Article 12 of the Hague Convention requires that a court "shall order the return of a child forthwith" where there has been a wrongful removal or retention, and less than one year has expired between the date of the wrongful removal or retention and "the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is." Even if commencement begins more than one year thereafter, the child "shall" be returned unless it is demonstrated that "the child is now settled in its new environment." Thus, a court is not bound to order the return of a child if respondent demonstrates by a preponderance of the evidence that (a) the proceedings were commenced more than one year after the date of the wrongful removal or retention, and (b) "the child is now settled in its new environment." Hague Convention, Article 12. The key dates under the Hague Convention are the dates of the wrongful removal or detention and "the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is." Article 12. Under ICARA the "commencement of proceedings" begins with the filing of a judicial petition. *Wojcik v. Wojcik,* 959 F.Supp. 413, 418–19 (E.D.Mich.1997). The Court makes alternative rulings as to this affirmative defense.

### (A) One Year Period Was Equitably Tolled:

The Petition (Doc. # 1) was filed in federal court on June 29, 2001. Therefore, the Court petition was not filed within one year of Respondent's wrongful removal on January 19, 2000, or wrongful retention on March 7, 2000. However, the Court finds as a matter of law that equitable tolling applies to this time period, and finds as a matter of fact that the time period in this case should be tolled until at least July 6, 2000, and more likely until November 6, 2000. Since the court petition was filed within one year these dates, this affirmative defense does not apply.

The Eleventh Circuit noted that the one year period was in some ways similar to a statute of limitations, but found it unnecessary to decide whether equitable tolling may apply under ICARA. *Lops,* 140 F.3d at 946. However, "[u]nless Congress states otherwise, equitable tolling should be read into every federal statute of limita-

tions." *Ellis v. General Motors Acceptance Corp.*, 160 F.3d 703, 706 (11th Cir. 1998). ICARA directs that the affirmative defenses in the Hague Convention be applied narrowly, 42 U.S.C. § 11601(a)(4), and there is no indication that Congress intended to preclude equitable tolling in this context. If equitable tolling does not apply to ICARA and the Hague Convention, a parent who abducts and conceals children for more than one year will be rewarded for the misconduct by creating eligibility for an affirmative defense not otherwise available. This case presents a perfect example of why equitable tolling must apply. Respondent removed the two children from Argentina while their father was on vacation. She left literally no indication what happened to her or the children, and did not indicate where she had taken them. For many months after her arrival in Florida, Respondent took intentional and significant steps to hide and conceal her and the children's whereabouts from Petitioner. This was successful until November 6, 2000. Additionally, the Hague Convention encourages voluntary resolution of such matters. The record establishes that Petitioner consistently sought to resolve the case without resort to Hague Convention proceedings or litigation. The U.S. State Department gave Respondent until July 6, 2000, to decide whether she would voluntarily return the child.

The Court concludes that at least the time through July 6, 2000, is tolled, and more probably the time through November 6, 2000. Since the Hague Convention petition was filed in federal court within a year of either date, this affirmative defense does not apply.

**(B) Well–Settled in New Environment:**

■ If there is no equitable tolling of the one year period, the affirmative defense would apply. Therefore, the Court will address in the alternative the merits of the "well-settled in the new environment" defense.

*Lops* directs the court to look at a number of relevant factors beyond a comfortable material existence to determine whether children are well settled. This includes the circumstances surrounding the children's living environment, the involvement of the parent(s), the active measures taken to conceal the children's whereabouts, and the possibility of prosecution for conduct taken to take or conceal the children. *Lops*, 140 F.3d at 946.

Since their arrival in Florida on January 19, 2000, the children have lived in seven different locations, including a domestic violence shelter. The longest they have spent at a single location has been approximately seven months. Until November, 2000, Respondent took active and consistent steps to prevent contact between the children and their father. Since November, 2000, Petitioner has been visiting the children on trips from Argentina. The children have had treatment for stress-related symptoms, although it is disputed whether the cause of the symptoms was witnessing domestic violence or the relocation and change of circumstances. The children have been attending school in Florida since March, 2000, and by all accounts are doing very well and are excelling in some areas. Both boys are consistently described as well-adjusted, healthy, happy, normal, bright, socially active children who participate in activities consistent with their ages. The teachers described the boys as very smart, and felt that neither would have trouble picking up Spanish again. There is little likelihood that Respondent will be prosecuted for any concealment of the children, as Petitioner

has promised to dismiss any criminal proceeding pending in Argentina and has testified that he believes his children need their mother.

The Court concludes that, under all the circumstances, the boys are not well-settled in Florida within the meaning of the Hague Convention. Even if they are well-settled, the Court finds that the goals of the Hague Convention would be furthered under the circumstances of this case by returning the boys to Argentina.

**(5) Grave Risk of Exposure to Physical or Psychological Harm or Intolerable Situation:**

■ A court is not bound to order the return of a child if respondent demonstrates by clear and convincing evidence that there is a grave risk that the child's return would "expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, Article 13 b; 42 U.S.C. § 11603(e)(2)(A). This exception therefore requires evaluation of the grave risk of physical harm to the children, psychological harm to the children, or if return would otherwise place the children in an intolerable situation. Like the other exceptions, this is a narrow exception. *England,* 234 F.3d at 270–71; *Whallon,* 230 F.3d at 459; *Nunez–Escudero,* 58 F.3d at 376.

The assessment focuses upon the children, and it does not matter if the Respondent is the better parent in the long run, had good reason to leave her home in Argentina and terminate her marriage, or whether she will suffer if the children are returned to Argentina. *Nunez–Escudero,* 58 F.3d at 377. "The exception for grave harm to the child is not license for a court in the abducted-to country to speculate on

where the child would be happiest." *Friedrich,* 78 F.3d at 1068. "A removing parent must not be allowed to abduct a child and then—when brought to court—complain that the child has grown used to the surroundings to which they were abducted." *Friedrich,* 78 F.3d at 1068.

This exception requires the alleged physical or psychological hare to be "a great deal more than minimal". *Whallon,* 230 F.3d at 459, quoting *Walsh v. Walsh,* 221 F.3d 204, 218 (1st Cir.2000). Only severe potential harm to the child will trigger this Article 13b exception. *Nunez–Escudero,* 58 F.3d at 377, quoting the Supreme Court of Canada, *Thomson v. Thomson,* 119 D.L.R.4th 253, 286 (Can. 1994). The harm must be greater than normally to be expected on taking a child away from one parent and passing the child to another parent. *Whallon,* 230 F.3d at 459. The harm of separating a child from the primary caretaker does not satisfy the Article 13b exception. *Rydder v. Rydder,* 49 F.3d at 372; *Nunez–Escudero,* 58 F.3d at 376. Adjustment problems that would attend the relocation of most children is not sufficient. *Friedrich,* 78 F.3d at 1067.

The "intolerable situation" portion of the exception requires more than a cursory evaluation of Argentina's civil stability and the availability of a tribunal to hear the custody complaint. It must encompass some evaluation of the people and circumstances awaiting that child in the country of his habitual residence. The Court may consider the environment in which the child will reside upon returning to Argentina. *Nunez–Escudero,* 58 F.3d at 377. The United States Department of State has stated that an "intolerable situation" under Article 13b was not intended to encompass situations such as return to a

home where money is in short supply, or where educational or other opportunities are more limited than in the new country. It gave as an example of "intolerable situation" where the custodial parent sexually abuses a child. 51 Fed.Reg. at 10510.

> In other words, at one end of the spectrum are those situations where repatriation might cause inconvenience or hardship, eliminate certain educational or economic opportunities, or not comport with the child's preferences; at the other end of the spectrum are those situations in which the child faces a real risk of being hurt, physically or psychologically, as a result of repatriation. The former do not constitute a grave risk of harm under Article 13(b); the latter do.

*Blondin v. Dubois*, 238 F.3d 153, 162 (2nd Cir.2001). At least one court had upheld consideration of whether the children were well settled in their new environment and the children's views of repatriation as part of the grave risk evaluation. *Blondin*, 238 F.3d at 157–60. In *Friedrich*, the Sixth Circuit indicated that the grave risk exception applies only (1) when returning the child meant sending him to a zone of war, famine or disease, or (2) in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence for whatever reasons may be incapable or unwilling to give the child adequate protection. *Friedrich*, 78 F.3d at 1069.

Dr. Harry Vanden is a professor of political science and international studies at the University of South Florida whose expertise includes Argentina. He last visited Buenos Aires, Argentina in April–May, 2002, and reports a dire situation. Dr. Vanden testified that there is currently a crisis in Argentina of uncommon proportions, even for a Latin American country.

He reported that the government and economic system lacked legitimacy; there had been five presidents in several months, violent demonstrations in the streets, and a profound lack of confidence in the economic system, low financial reserves and high debt; frozen bank accounts which prevented people from accessing their money; a bank scandal where only the wealthy or well-connected could withdraw money; exceptionally high unemployment and few job opportunities, instability and school strikes; anti-American sentiment and a resulting potential danger to Americans; a local justice system that was in disrepute and was functioning poorly if at all; and corruption in the judicial system and among the police; While not a war zone, Dr. Vanden described Argentina as a volatile situation which could turn violent at any moment, particularly in light of Argentina's history of brutal military takeovers, Fascist historical flavor, and a lack of a history of local police remedying civil rights violations. Dr. Vanden had no information about Pilar, Argentina in particular.

The testimony of the witness from the Pilar area of Argentina do not paint such a dire portrait. While acknowledging current economic and government problems, these witnesses testified that there were no demonstrations in the streets near them, or closed schools due to strikes. They were able to get money from the bank. No significant un-American sentiment was reported, even by the American who had lived in Argentina for many years. The children will be returning to the home in the Carmel Country Club from which they left, the family dog is still there, there are schools available comparable with those they left, and Petitioner has consulted a psychologist about the best ways of easing the transition for the boys.

Petitioner would like to have the boys' mother in Argentina, because he recognizes the children need their mother. There will undoubtedly be suffering by the children if Respondent decides not to accompany them to Argentina, but this alone or in combination with the other credible evidence in the case does not come within the grave risk exception. The Court finds that Respondent has not shown by clear and convincing evidence that there is a grave risk that the children's return to Argentina would expose them to physical or psychological harm or would otherwise place the children in an intolerable situation.

### (6) Human Rights and Fundamental Freedoms:

A court is not bound to order the return of a child if respondent demonstrates by clear and convincing evidence that if return of the child would not be permitted by fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms. Hague Convention, Article 20. Respondent has failed to produce sufficient evidence that the current situation in Argentina comes within this affirmative defense.

### IV. Conclusion

The Court finds by at least a preponderance of evidence that Petitioner has met his burden under the Hague Convention and ICARA of establishing that: 1) the two children habitually resided in Argentina prior to their removal on January 19, 2000; 2) Respondent breached Petitioner's custodial rights under Argentine law by removing the children from Argentina and retaining them in Florida; and 3) Petitioner possessed and was exercising custodial rights at the time of the children's removal and retention. Additionally, Respondent

has not satisfactorily established any affirmative defense. As the Eleventh Circuit has stated, "The Hague Convention is intended to restore the pre-abduction status quo . . ." *Lops*, 140 F.3d at 936. Therefore, the children must be returned to Argentina. While Respondent testified in no uncertain terms she would not go back to Argentina even if the children were ordered returned, her counsel has requested the imposition of undertakings in case she changes her mind. The Court will impose the conditions set forth below.

Accordingly, it is now

**ORDERED AND ADJUDGED** that:

1. Petitioner's Petition for Return of Children (Doc. # 1) is **GRANTED.**

2. Respondent Cathleen Mary Pizzutello, formerly known as Cathleen M. Mendez Lynch, is ordered to surrender custody of Dylan Teofilo Mendez Lynch and Brandon Martin Mendez Lynch to Petitioner Teofilo M. Mendez Lynch no later than twelve noon on August 16, 2002, for return to Argentina with Petitioner. Counsel for Petitioner shall coordinate arrangements with counsel for Respondent.

3. Dylan Teofilo Mendez Lynch and Brandon Martin Mendez Lynch shall be returned to Argentina at Petitioner's expense. Respondent may accompany Petitioner and the two children to Argentina if she chooses.

4. Teofilo M. Mendez Lynch shall dismiss any pending criminal proceedings in Argentina against Cathleen Mary Pizzutello, formerly known as Cathleen M. Mendez Lynch, relating in any way to the removal or retention of the children, shall take no steps to pursue or re-initiate such charges, and shall take all steps within his lawful power to see that such charges are not pursued, initiated or re-initiated.

5. The issue of permanent custody of the two children is to be determined by the court in Argentina.

6. The Clerk of the Court shall notify counsel for the parties of this Order immediately, and shall telefax a copy to counsel for Respondent upon request.